Filed 2/13/24  In re S.P. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.P. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. M.V., Defendant and Appellant. | F086727 (Super. Ct. Nos. 21CEJ300095-2, 21CEJ300095-3 & 21CEJ300095-4) **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]	Before Smith, Acting P. J., Meehan, J. and DeSantos, J.

M.V. (father) appeals from the juvenile court's order terminating his parental rights as to his three minor children, S.P., M.V., and A.V. (Welf. & Inst. Code,[1] § 366.26). He contends the court erred by declining to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2021, the Fresno Police Department placed a hold on then 13-year-old S.P., then 10-year-old M.V., and then three-year-old A.V., who lived with their mother L.P. (mother).[2] Mother had threatened three people with a gun, and when police executed a search warrant of her home, they found a gun in one of the children's dressers, drugs, and the home was a "complete disaster." Mother was transported to jail and eventually charged with two counts of assault with a firearm, criminal threats, and misdemeanor child abuse. A referral was made to the Fresno County Department of Social Services (department).

The department contacted father, who stated that there were no custodial orders in place and mother had kept the children from him; he denied knowing there were any issues in the home. Further investigation revealed there were past domestic violence issues between mother and father and that mother had a restraining order against father that expired six months prior. Father admitted to past issues of domestic violence with mother but denied it ever became physical and reported he did not have stable housing and was temporarily residing with his brother.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother's other child, N.P., was also living with mother and became subject to the dependency proceedings but turned 18 years old during the proceedings and is not a subject of this appeal. Mother is not a party to this appeal and has not appealed separately. We omit facts pertaining to N.P. and mother that are not relevant to the issue on appeal.

The department filed a juvenile dependency petition on behalf of the children alleging they came within the court's jurisdiction under section 300, subdivision (b)(1) because of mother's inability to protect the children due to her substance abuse. There were no allegations pertaining to father.

The court ordered the children detained on March 15, 2021. Father was ordered to be provided supervised visits at least once per week. The children were placed with their maternal grandmother.

In its combined jurisdiction/disposition report, the department recommended the children not be placed with father under section 361.2, subdivision (a). The department concluded placement would be detrimental due to father having a history of driving under the influence convictions, failure to complete a court-ordered alcohol program, inconsistent reports regarding how much contact he had had with the children, and history of domestic violence with mother. The children reported they were not interested in visiting with father but that visiting him was "sometimes … ok."

In July 2021, mother was declared not competent to stand trial in her criminal case, and in August 2021, was committed to the state hospital.

In August 2021, the court granted the department discretion to provide father with unsupervised reasonable, liberal, or extended visits with the children. Father was granted unsupervised visits in October 2021. The visits were reported to go well, and the children reported they enjoyed spending time with father but did not want to reunify with him.

On December 21, 2021, the juvenile court found the allegations in the petition true and that the children were described by section 300, subdivision (b) and adjudged the children dependents of the court. The children were removed from mother's custody, and the parents were ordered reunification services. Father was ordered to participate in parenting classes, a domestic violence evaluation and recommended treatment, a

3.

substance abuse assessment and recommended treatment, a mental health evaluation and recommended treatment, and random drug testing.

Mother was transported back to county jail in May 2022. Due to her incarceration and institutionalization, mother did not participate in reunification services and visited with the children via telephone.

Throughout the reunification period, the children were asked regularly about their relationships with father.

S.P. expressed she felt a lot of "hate" towards father for what "he did" to mother. She stated she wanted to continue to visit with father but wanted to stay with maternal grandmother because maternal grandmother understood S.P. better and S.P. felt "more safe" with maternal grandmother than with father. S.P. expressed fear that if she were to reunify with father "the niceness will wear off and he'll go back to his old self." She reported feeling anger toward her father for "acting like nothing happened." As the reunification period progressed, S.P. reported she wanted to remain with maternal grandmother and not reunify with her parents. At one point, S.P. expressed she knew father was trying his best but felt it would "fade away" and that he would "go back to the same ways." In September 2022, S.P. reported that her visits with father were going well and she looked forward to them and enjoyed them. She stated she would not feel safe residing with father but might in the future when she felt his anger was under control. When asked what types of thoughts she had regarding father not being in her life, she responded, "none."

M.V. refused to participate in visits for about a month in April 2022, and reported he did not want to see father because, during a previous visit, father got upset with M.V. for being "too serious." When father raised his voice, it gave M.V. "flash backs" and made him feel scared. M.V. started to visit with father again around May 2022 then stopped in June 2022 because father had been rude and called him ungrateful. M.V. reported father liked him the least and made fun of him. M.V. reported he felt "uneasy"

4.

around father and felt father was preparing to reunify by buying furniture, but M.V. did not want to reunify with father. He stated he did not feel safe around father because of what father had done in the past. M.V. continued not to visit with father through August 2022 and was consistent in his desire not to reunify with him. M.V. eventually began visiting with father again, and in September 2022, reported the visits were "alright" but that he did not always look forward to the visits and only participated in approximately half of the visits because sometimes he would just prefer to stay with his grandmother. He reported he did not think he would feel safe in father's care and did not believe anything could make him feel safe in father's care. He stated father had a history of angering quickly and used to yell at mother and him. He did feel loved by father and described his relationship with father as "o.k." He did not always feel comfortable speaking freely with father due to his past anger issues. He stated he did not want to spend more time with father, and when asked what types of thoughts he had about father not being in his life, M.V. responded, "I don't really think about it."

A.V. reported she enjoyed seeing father and liked going to father's house because she could play with her dogs. When asked if she wanted to spend more time with father in June 2022, A.V. responded, "no, I don't want to. I want to stay with grandma."

Father completed a parenting class with perfect attendance but reported he did not learn anything or agree with what he was taught. He participated in a domestic violence index and was recommended to participate in the child abuse intervention program and the batterer's intervention program. He started the program, but it was reported that he became confrontational with the facilitator of his program over an absence that he believed he did not have and needed to be switched to a different facilitator. He was observed to be engaged in class but "not applying what he is learning to his life."

At the contested combined six-, 12-, and 18-month review hearing conducted on November 15, 2022, the juvenile court terminated the parents' reunification services and

5.

reduced visits to supervised twice monthly one-hour visits. The court set a section 366.26 hearing.[3]

In its section 366.26 report, the department recommended adoption with the children's maternal grandmother as the children's permanent plan and termination of parental rights. Both S.P. and M.V. expressed wanting to be adopted. A.V. was too young to understand the concept of adoption but expressed she loved living with her grandmother, and S.P. and M.V. had expressed adoption would be best for A.V.

The report indicated father was consistent with visits. At visits, father would bring food and the family would play together. At times, it was observed that father had difficulty getting the children to communicate with him. Visits often ended with hugs. The report indicated father was affectionate towards the children but that the children view father as "more of a friendly visitor than their parental figure." There were moments during visits where the children would not communicate with father or just give one-word responses. The children were not consistent in hugging or kissing father goodbye and were not distressed when visits ended, often walking or running back towards their care provider.

The report opined it would not be detrimental to terminate parental rights as the children had appeared to develop a "significant parent-child relationship" with their maternal grandmother. The children appeared to be thriving in the care of their maternal grandmother and had been observed to be happy and comfortable in her presence.

---

[3] Father filed a petition for extraordinary writ in *M.V. v. Superior Court* (Feb. 10, 2023, F085318) nonpublished opinion, arguing (1) the court erred in finding the department provided him reasonable reunification services, (2) the court erred in finding it would be detrimental to return the children to his custody, and (3) the department failed to comply with its duty of inquiry under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.). The court issued a written opinion denying the petition and affirming all the juvenile court's findings and orders.

The children, as well as maternal grandmother, were interviewed regarding their relationships with father in May 2023.

S.P. reported she had a good relationship with father and felt comfortable when she was with him. When asked what thoughts or emotions came to mind when she thought about father, she responded, "I just wonder how he's doing." She reported feeling loved by father and that he showed his love by being supportive of her thoughts and ideas. She enjoyed visits, and having visits at the visitation center was "alright." She liked knowing how father was doing, and the visits made her feel closer to him. When asked if there was anything about current visits she did not like, she responded, "no, it's all good." She further stated she would like to have unsupervised visits with father even if her siblings were not present.

M.V. reported his relationship with father was "alright and getting better." When asked what thoughts or emotions came to mind when he thought about father, M.V. responded he did not have any. He felt loved by father because father was beginning to respect M.V.'s opinions as he had not done so in the past. M.V. was visiting father bi-weekly at the visitation center. He liked that the visits occurred at the visitation center and would only want unsupervised visits with father if all his siblings were present. When asked why, he shrugged "in an ambivalent manner" and stated, "I don't know." When asked if he wanted to spend more time with father, M.V. said he wanted visitation to stay the same and might feel comfortable with unsupervised visits in the future if his siblings were present. He stated he did not want unsupervised visits with father alone. M.V. stated he enjoyed speaking to father on the phone and they talked about sports and other general topics. He enjoyed visits with father because his siblings were present and sometimes missed father. When asked if there was anything about current visits he did not like, he responded, "no, it's all good."

When A.V. was asked various questions about her relationship with father, she stated she enjoyed visits with father but responded to most questions by "shrugg[ing] her shoulders in an ambivalent manner."

The maternal grandmother reported the children were happy before and after visits with father. The children had expressed to maternal grandmother they enjoyed visits with father and would like to spend nights on the weekend with him. They had not mentioned if they would like to return to father's care. She had noticed that since placed in her care, the children's self-confidence and self-esteem was better and they began prioritizing attending school and completing school assignments. They also had learned to respect the private spaces of other people. She planned on allowing the children to continue having contact with father if he was cordial and did not have an adverse effect on the children's wellbeing.

At the section 366.26 hearing conducted on August 1, 2023, counsel for the department argued in favor of the court following the recommendations in the report, and minor's counsel stated it agreed with counsel for the department. Father argued the beneficial parent-child relationship exception to termination of parental rights applied.

In ruling, the juvenile court noted it considered the reports and counsels' arguments. The court stated the relationship between father and the children resembled "one of friendship." The court alluded to M.V.'s statements that he did not want to be alone with father and wanted everyone to be present if he were to be with him. The court further noted the children wanted to be adopted and were happy living with their grandmother, who they had been living with for several years and who wished to adopt them. The court further concluded "the children's need for safety, stability and permanency outweighs the benefits of maintaining a parent/child relationship. It's sad to say, but the harm in severing the relationship between the minors and their parents does not outweigh the security, finality and the sense of belonging and security that the adoption would provide for the minors."

8.

The court ordered adoption as the children's permanent plan and terminated parental rights.

## DISCUSSION

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The California Supreme Court has clarified in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) that there are three elements a parent has the burden to prove by a preponderance of the evidence to justify the application of the beneficial parent-child relationship exception: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id*. at pp. 632–633, 636–637.)

In determining the second element—whether the children would benefit from continuing the relationship—the court may consider factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

9.

In determining the third element, courts look at "whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Courts must "determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life…. [¶] … That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Ibid.*) Courts may consider whether the child will experience effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as well as how a "new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

We review the first two elements—whether the parents regularly and consistently visited and whether a beneficial relationship exists—for substantial evidence and the third element—whether "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home"—for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 639–641.) Under the substantial evidence standard of review, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id.* at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court

10.

has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)[4]

The parties agree father regularly and consistently visited the children; therefore, we will focus our discussion on the second and third elements. We note father's briefing focuses almost exclusively on the evidence on the record that supports his position and ignores the more robust evidence that supports the juvenile court's ruling. We conclude the juvenile court did not err by finding father did not make an adequate showing that the children had a beneficial relationship with him, or that the children would suffer detriment when weighed against the benefits of adoption.

Throughout the dependency proceedings, M.V. expressed many negative emotions regarding father and chose not to participate in several visits. He expressed suffering "flash backs" of father's anger and yelling at him and mother, and felt father liked him the least out of all his siblings. By the time of the section 366.26 hearing, he was, at best, neutral about his relationship with father describing it as "alright but getting better." He still did not want to be alone with father and only wanted to spend additional time with him if his siblings were present. He desired to be adopted. There was not compelling evidence that M.V. had a substantial, positive, emotional attachment to father or that any harm M.V. would suffer was not outweighed by the benefits of adoption.

As for S.P., she had a more positive outlook on her relationship with father than did M.V.; her statements indicated she enjoyed being with father and wanted to spend time with him, but there was not compelling evidence that their relationship rose to the level of the substantial, positive, emotional attachment required for application of the

---

[4]    The *Caden C.* court explained " 'there likely will be no practical difference in application of the two standards,' " but "[a]t its core, the hybrid standard we now endorse simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

beneficial parent-child relationship exception. It appears that over the course of the dependency proceedings, S.P.'s feelings of hatred and unease toward father developed into something more positive, but she was consistent throughout the case she did not want to reunify with father. Even if we assume S.P. did have a beneficial relationship with father, we cannot say it was an abuse of discretion for the court to have concluded that any harm S.P. might suffer was outweighed by the benefits of adoption. S.P. expressed she wanted to be adopted. This is particularly significant because S.P. was 16 years old at the time of the section 366.26 hearing. She was capable of understanding the concept of adoption and could have objected to being adopted (see § 366.26, subd. (c)(B)(ii)) but did not.

As for A.V., she was very young when removed from mother, and it is unclear from the record how much time she spent with father before entering dependency or if she had any substantial relationship with him at the outset of the case. At the time of the section 366.26 hearing, she was too young to understand the concept of adoption and perhaps too young, or too shy, to give meaningful responses to questions asked about her relationship with father. It appears she enjoyed visits, but there was no evidence that she was particularly attached to father or that she suffered from separation-induced emotional distress or behavioral issues. The court was not unreasonable in concluding father had not met his burden of showing A.V. had a beneficial relationship with him or that she would suffer detriment from the termination of parental rights.

Father faults the juvenile court for stating that the children's relationship with father was like a "friendship," contending this demonstrated an "inaccurate and narrow" view of the relationship. We disagree and find the court's characterization to be a generous one, particularly for M.V., who at the time of the section 366.26 hearing did not want to be alone with father without his siblings present. While the record indicates that father's relationship with the children—which was not particularly strong or positive at the outset of the case—was improving, the juvenile court was certainly reasonable in

12.

finding father did not meet his burden of showing it was a compelling reason for the court to determine termination of parental rights would be detrimental to the children.

To the extent father is arguing that the juvenile court's ruling was in any way legally deficient because it did not conduct a thorough enough analysis on the record or "comport with the requirements established in *Caden C.*," we reject this assertion. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [juvenile court is not required to make express findings when it concludes that parental rights termination would not be detrimental].) The cases father relies on to support his argument that remand is appropriate—*In re J.D.* (2021) 70 Cal.App.5th 833 and *In re Dy.P.* (2022) 76 Cal.App.5th 153—are not apposite. In those cases, the parents appealed from orders terminating parental rights made before *Caden C.* was decided, and the appellate courts remanded the matters to ensure the juvenile courts did not rely on factors the *Caden C.* court deemed improper. Here, the juvenile court's order was made over two years after *Caden C.* was decided. We presume the juvenile court considered all the relevant points in *Caden C.* in making its decision. (See *Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563 [we presume the trial court followed the law].) We do not find the juvenile court's ruling legally deficient nor that the record indicates it misapplied the law.

For the reasons set forth, we conclude the court did not err by declining to apply the beneficial parent-child relationship exception to termination of parental rights.

## **DISPOSITION**

The juvenile court's order terminating parental rights is affirmed.

13.